# EXHIBIT A

**RECEIVED**

MAY 1 4 2021

American Arbitration Assoc. (2)

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** NEW YORK

-----------------------------------------------------------------x
Marcia Schorr,

                          Plaintiff/Petitioner,


              - against -                              Index No. 653150/2021
American Arbitration Association; and The
International Center For Dispute Resolution,

                          Defendant/Respondent.
-----------------------------------------------------------------x

## NOTICE OF ELECTRONIC FILING
### (Mandatory Case)
(Uniform Rule § 202.5-bb)

**You have received this Notice because**:

> 1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

> 2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
  Give this Notice to your attorney. (Attorneys: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you must have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

  The **benefits of participating in e-filing** include:

  - serving and filing your documents electronically

  - free access to view and print your e-filed documents

  - limiting your number of trips to the courthouse

  - paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit: www.nycourts.gov/efile-unrepresented or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile ; or

2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).

Dated: 05/12/2021

DAVID E. SCHORR, ESQ.                                    295 MADISON AVENUE, FLOOR 12
Name                                                                    Address
DAVID E. SCHORR, ESQ.
                                                                              NEW YORK, NY 10017
Firm Name

                                                                              (917) 756-5983
                                                                              Phone


                                                                              E-Mail


To:


                                                                                                    6/6/18

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------- x

Marcia Schorr                                                :

                                    Plaintiff,               :

                  - against -                                :

American Arbitration Association; and                        :
The International Centre for Dispute Resolution

                                                             :

                                    Defendants.

-------------------------------------------------------------- x

_0 S / 12 / 2021_

Index No.

**SUMMONS**

Venue: New York County

 

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve

a copy of your answer on plaintiff's attorney within 20 days after service of this summons,

exclusive of the day of service (or within 30 days after the service is complete if this summons is

not personally delivered to you within the State of New York); and in case of your failure to appear

or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:  New York, New York
       May 12, 2021

 

                                 /s/ David E. Schorr
                                 David E. Schorr, Esq.
                                 Attorney for Plaintiff
                                 295 Madison Avenue, Floor 12
                                 New York, NY 10017
                                 (917) 756-5983

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------- x

Marcia Schorr

                            Plaintiff,        :

                      - against -          :          Index No.

                                            **COMPLAINT**

American Arbitration Association; and        :
The International Centre for Dispute Resolution

                                        :

                            Defendants.

------------------------------------------------------------- x

Plaintiff Marcia Schorr through her attorney David E. Schorr[1] alleges as follows:

## FACTS

1.      Plaintiff resides in Queens County, New York.

2.      Defendants are the American Arbitration Association ("**AAA**") and the International Centre for Dispute Resolution, an international division of the AAA ("**ICDR**" and together with the AAA, the "**AAA-ICDR**"), each with a principal place of business in New York County.

3.      For the 2019 tax year, the AAA reported revenues connected to its arbitration and mediation services of $111,080,054.00.[2] In the same year, not including monies spent with respect to its various websites,[3] the AAA spent $2,735,144.00 directly on the "advertising and promotion" of those arbitration and mediation services.[4]

---

[1] I am also Plaintiff's son and represented Plaintiff in the arbitration proceeding discussed herein.

[2] See Form 990, Line 2a of Part VIII (Statement of Revenue) filed by AAA for the 2019 tax year.

[3] In the 2019 tax year, the AAA spent $2,901,419 on "information technology expenses." See Form 990, Line 14 of Part IX (Statement of Functional Expenses) filed by AAA for the 2019 tax year.

[4] See Form 990, Line 12 of Part IX (Statement of Functional Expenses) filed by AAA for the 2019 tax year.

4.      The respondent in the arbitration proceedings discussed below (the "**Respondent**") is from a wealthy and prominent English family and is a graduate of Eton and Cambridge. He is a New York resident and a national of the U.S., the U.K., and Cuba.

5.      In September 2018, Plaintiff entered into an Operating Agreement[5] with Respondent (the "**Operating Agreement**"), pursuant to which a New York limited liability company (the "**Company**") was to be established as the owner of approximately 85 acres of rural land located on or near a UNESCO World Heritage Site in Cuba ("**Property**"). Under the present laws of both the U.S. and Cuba, it is extremely difficult for persons subject to U.S. jurisdiction, as well as those who are not nationals of Cuba, to own real estate or property rights in Cuba. Accordingly, although Plaintiff paid "only" $45,000 for her one-half interest in the Property (infra), the Property is worth substantially more than that amount.

6.      In return for Plaintiff investing $45,000 (the "**Original Investment**"), she received a 50% membership interest in the Company. Respondent holds the other 50% membership interest in the Company.[6]

7.      Plaintiff subsequently made additional payments to Respondent totaling approximately $3,696.10 in respect of the Property (the "**Additional Investment**").

8.      Shortly after execution of the Operating Agreement, the Company's articles of organization were filed with New York's Secretary of State.

9.      The Property was to be used in conformity with Article 3.1 of the Operating Agreement.

---

[5] To be provided later to the Court under seal.

[6] Although Exhibit A to the Operating Agreement lists Respondent as having also contributed $45,000, he did not contribute $45,000 or any other amount in exchange for his 50% membership interest.

3

10.     The Operating Agreement is governed by New York law[7] and requires that all disputes thereunder be "settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules" (the "**Commercial Rules**").[8]

11.     Under Article 11.5 (b) of the Operating Agreement, the arbitrator may "determine how the costs and expenses of the arbitration shall be allocated between the parties . . ." The arbitrator also has such authority under Rule 47 of the Commercial Rules.

12.     The arbitration provision of the Operating Agreement includes the following clause (the "**Inquest Clause**"):[9]

> The parties agree that failure or refusal of a party to pay his/her required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that party to present evidence or cross-examine witness [sic]. In such event, the other party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award. Such waiver shall not allow for a default judgment against the non-paying party in the absence of evidence presented as provided for above.

13.     The Inquest Clause (including the typo contained therein) was taken verbatim from the AAA-ICDR's ClauseBuilder tool – an online drafting tool advertised by the AAA-ICDR.

14.     The term "ClauseBuilder" is a registered trademark of the AAA.

15.     The AAA-ICDR markets its ClauseBuilder tool on various websites, including the AAA's main website (adr.org) and the ICDR's main website (icdr.org), as well as a separate website specific to the ClauseBuilder tool (clausebuilder.org).

16.     The AAA-ICDR uses its ClauseBuilder tool as a marketing tool to attract business and to differentiate itself from its competitors (such as JAMS).

---

[7] See Article 11.4 of the Operating Agreement.
[8] See Article 11.5 (a) of the Operating Agreement.
[9] See Article 11.5 (b) of the Operating Agreement.

17.    The AAA-ICDR's websites include the following statements regarding ClauseBuilder:

> Alternative dispute resolution (ADR) allows parties to customize their dispute resolution process. Parties can insert the standard arbitration or mediation clause in their contract and can further customize their clause with options that control for time and cost.
>
> **A well-written dispute resolution clause is the foundation of an effective dispute resolution process.**[10]
>
> The AAA developed the **ClauseBuilder® online tool**[11]—a simple, self-guided process--to assist individuals and organizations in developing clear and effective arbitration and mediation agreements.[12]

18.    The AAA-ICDR markets the Inquest Clause as an "option" that parties may adopt with respect to the "Non-Payment of Arbitration Expenses":[13]

> The Commercial Rules provide parties with certain remedies if arbitrator compensation or administrative charges have not been paid in full by either side. However, parties can agree to certain consequences (i.e.: waiver) if either party fails to pay its share of required deposits for arbitrator compensation or administrative charges by including the following option [re: the Inquest Clause].

19.    Plaintiff included an arbitration provision in the Operating Agreement with the AAA as the arbitral body in reliance on the AAA-ICDR's Inquest Clause.

20.    Had Plaintiff known that the AAA-ICDR did not stand by the enforceability of the Inquest Clause (infra) in its own arbitrations, Plaintiff would not have agreed to arbitration in the Operating Agreement or to the AAA as the arbitral body.

21.    The AAA-ICDR's ClauseBuilder includes terms and conditions that "The AAA makes no representations or warranties regarding the enforceability of clauses or the AAA's acceptance for administration of matters that might be based upon the ClauseBuilder." However,

---

[10] Bold in the original.
[11] Bold in the original.
[12] See, e.g., www.adr.org/Clauses, last accessed April 13, 2021.
[13] See **Exhibit A** hereto.

that language does not make clear that the AAA-ICDR does not stand by the enforceability of the Inquest Clause in its own arbitrations. Why would the AAA-ICDR market an Inquest Clause that is not enforceable in its own arbitrations?

22. Furthermore, when Plaintiff chose the AAA as the arbitral body, Plaintiff did so without knowing that the AAA-ICDR considers itself (infra) to have the authority to unilaterally terminate an arbitration prior to completion due to the misconduct of a respondent. Had Plaintiff known the AAA-ICDR's position, Plaintiff would not have chosen or used the AAA as the arbitral body.

23. On February 25, 2020, Respondent informed Plaintiff that he intended to sell the Property to an undisclosed purported buyer, without the Plaintiff's consent, "within the next 48 hours."

24. (Because the AAA-ICDR terminated the arbitration prior to completion, infra, Plaintiff still has no knowledge of what Respondent has done with the Property. Given that Respondent adamantly refused to tell the Plaintiff and the arbitrators who the Property had been purportedly "sold" to, it appears likely that Respondent "sold" the Property to a "straw person" who now holds title on behalf of the Respondent.)

25. Thereafter, Plaintiff filed a demand for arbitration with the AAA, including an emergency application for a preliminary injunction preventing the Respondent from disposing of the Property pending the outcome of the arbitration.

26. Prior to accepting the case for arbitration, the AAA-ICDR required Plaintiff to provide it with a copy of the Operating Agreement's arbitration provision. At no time prior to or after accepting the case for arbitration did the AAA-ICDR inform Plaintiff that the Inquest Clause or any other clause of the arbitration provision might, for some reason, not be enforceable. At no

time prior to or after accepting the case for arbitration did the AAA-ICDR inform Plaintiff that it could terminate the arbitration prior to completion due to Respondent misconduct.

27.     As a further precondition to accepting the case for arbitration, the AAA-ICDR required Plaintiff to pay a fee of $3,750.00.

28.     Plaintiff paid the $3,750.00 fee based on the assumption that Plaintiff would have the opportunity to recover the fee from the Respondent in a final arbitration award.

29.     Had Plaintiff known either that the AAA-ICDR (1) does not stand by the enforceability of its Inquest Clause, or (2) could terminate an arbitration prior to completion due to Respondent misconduct, Plaintiff would not have filed for arbitration with the AAA-ICDR and would not have applied to the AAA-ICDR for a preliminary injunction.

30.     The AAA-ICDR appointed an emergency arbitrator to hear the application for the preliminary injunction (the "**Emergency Arbitrator**").

31.     On February 27, 2020, the AAA-ICDR requested that Plaintiff pay a deposit of $19,950.00 for the Emergency Arbitrator's compensation.   The written request contained a warning that the Emergency Arbitrator could postpone or terminate the proceeding if the money was not paid.  Neither in that written request or at any other time did the AAA-ICDR inform Plaintiff that it could unilaterally terminate the arbitration prior to completion due to Respondent misconduct.

32.     On February 27, 2020, Plaintiff paid the requested $19,950.00 in reliance on the fact that Plaintiff would have the opportunity to recover the amount from the Respondent in a final arbitration award.

33.     Throughout the entirely of the arbitration proceedings, Respondent was repeatedly abusive, disrespectful and threatening to the AAA-ICDR's personnel, to the Emergency Arbitrator,

and to the Arbitrator (as defined below). Throughout the arbitration proceedings, Respondent repeatedly refused to comply with the orders and directives of the AAA-ICDR and the arbitrators, and sought repeatedly to subvert the arbitration process. Plaintiff engaged in no such conduct and complied at all times to the greatest extent possible with all orders and directives of the AAA-ICDR and the arbitrators.

34.     On February 28, 2020, the Emergency Arbitrator held a scheduling conference. On the call, the Respondent, among other things, stated that he did not recognize the Emergency Arbitrator's authority; that the arbitration was "ridiculous" and "illegal;" and that the Emergency Arbitrator and the AAA (by conducting the arbitration) were acting "in an aggressive and antagonistic manner towards [him]." In addition, Respondent threatened the Emergency Arbitrator personally, falsely claiming that Respondent's purported not-for-profit organization was investigating both the Emergency Arbitrator and the Emergency Arbitrator's law firm (Foley Hoag LLP) "for gross overbilling and attorney misconduct."

35.     Shortly thereafter, the Respondent sought to recuse the Emergency Arbitrator. In his recusal application, Respondent attacked both the Emergency Arbitrator and Plaintiff's attorney as "two rich Jewish, American attorneys."

36.     Plaintiff opposed – and the AAA-ICDR denied – Respondent's recusal application.

37.     On March 16, 2020, the Emergency Arbitrator issued an order granting Plaintiff's application for a preliminary injunction.

38.     Further, the Emergency Arbitrator ordered Respondent to pay 50% of the costs (subject to further allocation in the final arbitration award) incurred by Plaintiff in connection with the application for the preliminary injunction. Respondent did not comply with the Emergency Arbitrator's order and has never paid any part – much less 50% – of such costs.

8

39.     On March 20, 2020, the AAA-ICDR advised the parties in writing that, going forward, it would bill the Plaintiff and the Respondent "in equal shares" for all arbitration fees and expenses.

40.     On April 28, 2020, the AAA-ICDR appointed a new arbitrator to preside over the remainder of the arbitration (the "**Arbitrator**").

41.     Shortly thereafter, the Respondent sought to recuse the Arbitrator.   Plaintiff opposed – and the AAA-ICDR denied – the Respondent's recusal application.

42.     As with the Emergency Arbitrator, the Respondent repeatedly threatened and abused the Arbitrator.  And reminiscent of Respondent's anti-Semitic attack on the Emergency Arbitrator (supra), the Respondent would repeatedly, consistently, and purposely at every single telephonic arbitration appearance, mispronounce the Arbitrator's Jewish-sounding last name to make it sound "more" Jewish-sounding.

43.     On May 4, 2020, the AAA-ICDR informed the parties that the Arbitrator had requested a deposit of $5,000.00 for his fees.  The AAA-ICDR's written request contained a warning that the Arbitrator had the power under the Commercial Rules to postpone or terminate the proceeding if the money was not paid.  The AAA-ICDR requested that the money be paid "no later than May 18, 2020."  The date of May 18, 2020 was highlighted by the AAA-ICDR in bold.

44.     Neither in that written request or at any other time did the AAA-ICDR inform Plaintiff that the AAA-ICDR could terminate the arbitration prior to completion due to Respondent misconduct.

45.     Plaintiff paid Plaintiff's one-half share (i.e. $2,500.00) of the $5,000.00 fee deposit. Plaintiff did so in reliance on the fact that Plaintiff would have the opportunity to recover this money from the Respondent in a final arbitration award.

46.     On May 19, 2020, the AAA-ICDR advised in writing that Respondent had not paid his $2,500.00 share of the Arbitrator's deposit and requested that Plaintiff pay the $2,500.00 no later than May 21, 2020. Neither in that written request or at any other time did the AAA-ICDR inform Plaintiff that the AAA-ICDR could terminate the arbitration prior to completion due to Respondent misconduct.

47.     On May 20, 2020, Plaintiff paid the $2,500.00 in question. Plaintiff did so in reliance on the fact that Plaintiff would have the opportunity to recoup the money in a final arbitration award.

48.     Thereafter, the AAA-ICDR informed Plaintiff that, although the Emergency Arbitrator had stepped down in March 2020, an additional $5,054.00 was owed to the Emergency Arbitrator (the "**Additional Emergency Arbitrator Compensation**").

49.     In its Notice of Compensation Arrangements, the AAA-ICDR warns its arbitrators that if money is still owed to arbitrators by the parties after their service has ended, the "AAA is authorized *but not obligated* to seek to collect these monies on your behalf by all lawful means . . ."[14]

50.     Nonetheless, the AAA-ICDR required Plaintiff – rather than the Respondent – to pay all of the Additional Emergency Arbitrator Compensation as a precondition to the arbitration going forward and not being terminated. Plaintiff paid the Additional Emergency Arbitrator Compensation in reliance on the fact that Plaintiff would have the opportunity to recover the money in a final arbitration award.

51.     In an email dated May 29, 2020, the AAA-ICDR assured Plaintiff that:

---

[14] Emphasis added.

> Please note that Plaintiff's advancement of 100% of the arbitrator's compensation fees is subject to reallocation and shall be assessed by the arbitrator in the final award (R-47 of the Commercial Arbitration Rules).

52.     In neither that email or in any other communication did the AAA-ICDR inform Plaintiff that it could terminate the arbitration prior to completion due to Respondent misconduct.

53.     On June 22, 2020, the Arbitrator issued a scheduling order directing the steps necessary for completion of the arbitration.

54.     On June 26, 2020, the AAA-ICDR advised in writing that the Arbitrator had requested an additional $5,000.00 deposit. The AAA-ICDR requested that Plaintiff pay all of the $5,000.00 deposit.

55.     On July 2, 2020, the AAA-ICDR requested in writing that Plaintiff pay the additional $5,000.00 deposit "no later than close of business July 16, 2020." The date of July 16, 2020 was highlighted by the AAA-ICDR in bold. The AAA-ICDR warned Plaintiff that the Arbitrator had the power under the Commercial Rules to postpone or terminate the arbitration if the additional deposit was not paid.

56.     Neither in that communication or in any other communication did the AAA-ICDR inform Plaintiff that the AAA-ICDR could terminate the arbitration prior to completion due to Respondent misconduct. .

57.     On or about July 6, 2020, Plaintiff asked the Arbitrator for permission to apply "for an order ordering the parties to each pay half of the additional [$5,000.00] deposit." On July 8, 2020, the Arbitrator denied Plaintiff's request – thereby requiring Plaintiff to pay all of the Arbitrator fees – on the following grounds:

> before I render the final award, I will entertain an application that I assess the 100% of the arbitrator fees and AAA costs against one party. It's premature to entertain the issue at this stage.

58.     Following an extension of the July 16, 2020 due date, Plaintiff paid all of the additional $5,000.00 deposit in question and did so based on the fact that Plaintiff would have the opportunity to recover the amount in a final arbitration award.

59.     Given the Respondent's failure to pay any part of the fees and expenses of the arbitration, Plaintiff asked the Arbitrator to enforce the Inquest Clause and to thereby conclude the arbitration by holding an inquest on damages.

60.     In an order dated September 4, 2020,[15] the Arbitrator declined to enforce the Inquest Clause on the grounds that the Inquest Clause conflicted with paragraph (b) of Commercial Rule 57 (Remedies for Nonpayment), which states in relevant part that: "In no event, however, shall a party be precluded from defending a claim or counterclaim."

61.     The Arbitrator – reasoning that "The AAA's Commercial Rules are incorporated by reference into the parties' underlying arbitration provision and, as such, the parties are bound by those rules" [16] – failed to take into account, among various other things, that Rule 1 of the AAA's Commercial Rules expressly states that "The parties, by written agreement, may vary the procedures set forth in these rules."[17]

---

[15] To be provided later to the Court under seal.

[16] See Arbitrator's order dated September 4, 2020 (to be provided later to the Court under seal).

[17] The Arbitrator's declination to enforce the Inquest Clause was particularly odd given that several years previously, he had published a law review article that had opened with the following paragraph:

> There is a hole in our arbitral system . . . [A]rbitration is dangerously susceptible to the problem of nonpayment. Simply put, a respondent seeking to avoid liability may be able to "game" the system by refusing to pay its share of arbitration fees. All too frequently, this leaves the claimant without an effective remedy to hold the nonpaying respondent accountable.

62.    The AAA-ICDR denied Plaintiff's requests to take some kind of action, either directly or indirectly, to cause the Inquest Clause to be enforced.

63.    On November 6, 2020, the AAA-ICDR sent an email requesting that Plaintiff pay $8,041.66 "within two weeks" to cover (1) $2,541.66 in existing Arbitrator fees and (2) a new fee deposit requested by the Arbitrator of $5,500.00.  The amount of $8,041.66 was highlighted by the AAA-ICDR in bold and was accompanied by a warning that "If payment is not received in full by the date established [i.e., "within two weeks"], it is within the Arbitrator's discretion to suspend the proceedings for nonpayment under R-57 of the Commercial Rules." Neither in that email or in any other communication did the AAA-ICDR inform Plaintiff that the AAA-ICDR could terminate the arbitration prior to completion due to Respondent misconduct.

64.    On November 10, 2020, the AAA-ICDR sent another email requesting payment of the $8,041.66 in question and requested that the amount be paid "no later than close of business November 24, 2020." The date of November 24, 2020 was highlighted by the AAA-ICDR in bold. In the email, the AAA-ICDR warned that the Arbitrator "has the power under the [Commercial] Rules to postpone or terminate the proceeding" if the amount was not paid.  Neither in that email or in any other communication did the AAA-ICDR inform Plaintiff that the AAA-ICDR could unilaterally terminate the arbitration prior to completion due to Respondent misconduct.

---

To fill that "hole" in the system, the Arbitrator had urged that:

> attorneys drafting contracts with arbitration clauses can anticipate this pitfall by providing that the failure to pay fees constitutes a material default entitling the paying party to proceed in court to an inquest on damages if the arbitrators refuse to move forward.

It is not clear why the Arbitrator believed that parties can contractually agree to an inquest by a court, but not to an inquest by an arbitrator under exactly the same circumstances.

65.     On November 24, 2020, Plaintiff paid the $8,041.66 in question.  Plaintiff did so in reliance on the fact that Plaintiff would have the opportunity to recover the money in the final arbitration award.

66.     In an order dated December 18, 2020,[18] the Arbitrator granted Plaintiff's request to strike Respondent's counterclaims due to his failure to pay any of the arbitration fees and expenses.  In addition, the Arbitrator struck nearly all of Respondent's discovery requests – which discovery requests spanned 8 pages and consisted of 34 documentary requests, each with multiple subparts – as "per se objectionable."  (Plaintiff's discovery request, in contrast, consisted of one sentence, which Respondent nonetheless refused to comply with at all.)

67.     In addition to threatening and abusing the Emergency Arbitrator and the Arbitrator, Respondent also threatened and abused both of the AAA-ICDR's case managers.  In perhaps his most strident written communication to the case managers, Respondent accused the case managers of taking part in "aiding and abetting [Plaintiff's attorney's] illegal actions" and threatened to sue them personally.

68.     As a result of Respondent's misconduct throughout the proceedings, on October 21, 2020, the AAA-ICDR sent an email instructing the parties to comply with the "AAA-ICDR Standards of Conduct for Parties and Representatives" (the "**Standards**").[19]

69.     The Standards contain a statement that "Participants in AAA cases are required to abide by the following standards of conduct, and failure to do so may result in the AAA declining to further administer a particular case or caseload."  Apparently, this statement forms the basis of

---

[18] To be provided later to the Court under seal.
[19] Attached hereto as **Exhibit B**.

the AAA-ICDR's apparent position that it had some kind of authority to terminate the arbitration prior to completion due to Respondent misconduct.

70.     Throughout the entirety of the arbitration, Plaintiff complied at all times to the greatest extent possible with all of the Standards.

71.     In an order dated March 5, 2021,[20] the Arbitrator set the arbitration down for a hearing and directed that the arbitration proceedings be completed no later than end of May 2021.

72.     In a calculated (and successful) attempt to scare the AAA-ICDR and the Arbitrator from holding the hearing (and thereby complete the arbitration), on March 8, 2021, the Respondent sent a letter to the Arbitrator and to the AAA-ICDR in which he threatened the AAA-ICDR and the Arbitrator personally, warned the Arbitrator "to consider [his] position very carefully," demanded that the Arbitrator unilaterally recuse himself, and threatened the AAA-ICDR and the Arbitrator with unspecified consequences if the Arbitrator nonetheless went forward with the hearing and completed the arbitration.    Respondent's letter also contained the following accusations and statements with respect to the Arbitrator:

- He accused the Arbitrator of "Gross Prejudice against Respondent in your rulings" and "Blatant bias in favor of the Plaintiff."

- "You have given [Respondent] as much chance of prevailing at your 'hearing' as the Putin-run court in Russia gave Alexei Navalny of receiving a fair trial."

- He accused the Arbitrator of "turning the AAA into a kangaroo court."

- "How do you expect respondent to participate in a hearing where due process is trampled upon so shamefully?"

- He accused the Arbitrator of "committing fraud upon both Respondent and this [arbitration] Tribunal."

- He accused the Arbitrator of "rendering the [upcoming] hearing into a poorly written farce."

[20] To be provided later to the Court under seal.

- He accused the Arbitrator of causing him to suffer "Legal Abuse Syndrome (LAS), a form of post-traumatic stress disorder, brought about by legal abuse, ethical violation, protracted litigation, abuse of power and/or authority, lack of accountability, and fraud.  Its symptoms include acute anxiety and psychological stress, sleep loss and disruption – all symptoms Respondent which [sic] has been suffering as a result of your protracted and abusive handling of this case."

- "Respondent understands that you want to expand your equities portfolio, but your efforts in this case to enrich yourself have crossed a line.  And they have caused – and continue to cause – actual psychological and emotional harm. Respondent holds you and the AA [sic] largely accountable and liable for these abusive practices.  He reserves all rights to report and remedy them, including in the court of public opinion."

73.    Plaintiff informed the AAA-ICDR in a brief response that Plaintiff "oppose[d] the Arbitrator's recusal and will oppose any application by the Respondent to recuse the Arbitrator."

74.    On March 9, 2021, the AAA-ICDR advised the parties that it would be responding "promptly" "on the issues raised through [Respondent's] letter."

75.    On March 19, 2021, that response came: The AAA-ICDR informed the parties that it had "administratively" terminated the arbitration due to "our employees and the arbitrator hav[ing] been subjected to continued violations of the Standards . . ."

## FIRST CAUSE OF ACTION
### (Breach of contract due to termination of the arbitration prior to completion)

76.    From the start of the arbitration in February 2020 and through its termination prior to completion in March 2021, Plaintiff acted in reliance on the assumption that the arbitration would be completed and a final arbitration award issued.

77.    Each time that Plaintiff made payments to the AAA-ICDR, Plaintiff did so based on that assumption.

78.    Based on that assumption, Plaintiff forbore the pursuit of other remedies, whether outside the arbitration process or with a different arbitral body.

79.     The termination of the arbitration prior to completion caused the Plaintiff to waste over one year in fruitless arbitration, as well as large amounts of time devoted to complying with the orders and directives of the arbitrators and the AAA-ICDR.

80.     The termination of the arbitration prior to completion has prevented Plaintiff from discovering the status or purported disposition of the Property.

81.     The termination of the arbitration prior to completion has compelled Plaintiff to impair the confidentiality of the arbitration and the subject matter thereof due to the necessity of this lawsuit.

82.     The termination of the arbitration prior to completion caused Plaintiff to spend $46,795.66 in arbitration fees and expenses to no avail and deprived Plaintiff of the opportunity to recover any of those fees and expenses in a final arbitration award.

83.     The termination of the arbitration prior to completion deprived Plaintiff of the opportunity to recover in the arbitration the $45,000 Original Investment and the $3,696.10 Additional Investment.

84.     The AAA-ICDR was engaged to administer an arbitration proceeding.  Having been so engaged, the AAA-ICDR had a contractual duty to protect the integrity of the arbitration process and to cause the arbitration to be completed and a final decision to be issued.

85.     Over an approximately 14-month period, Plaintiff paid to the AAA-ICDR all of the fees and expenses of the arbitration – $46,795.66 in total – when and as requested by the AAA-ICDR.

86.     Plaintiff complied to the greatest extent possible with all of the directives and orders of the AAA-ICDR and its arbitrators, as well as all of the Standards.

87.     By terminating the arbitration prior to completion due to Respondent misconduct, the AAA-ICDR breached its contractual duties to Plaintiff and rewarded Respondent for his misconduct.

88.     Plaintiff respectfully requests damages in the amount of the $46,795.66 in arbitration fees and expenses, the $45,000 Original Investment, and the $3,696.10 Additional Investment.

## SECOND CAUSE OF ACTION
### (Breach of implied covenant of good faith and fair dealing due to termination of the arbitration prior to completion)

89.     The contractual relationship between Plaintiff and the AAA-ICDR included an implied covenant of good faith and fair dealing.

90.     The AAA-ICDR's termination of the arbitration prior to completion due to Respondent's misconduct (as well as the AAA-ICDR's failure to reimburse Plaintiff's arbitration fees and expenses upon such termination) constituted a breach of that covenant.

91.     Plaintiff suffered the same damages as under her First Cause of Action.

## THIRD CAUSE OF ACTION
### (Breach of contract with respect to the Inquest Clause)

92.     The AAA-ICDR had a contractual duty to honor the Operating Agreement's arbitration provision in full so long as that provision complied – as it does – with New York law.

93.     By failing to uphold the Inquest Clause, the AAA-ICDR breached its contractual duties to Plaintiff.

94.     Such failure resulted in the arbitration being unnecessarily prolonged and Plaintiff thereby being compelled to incur unnecessary fees and expenses, the amount of such unnecessary fees and expenses to be determined, if necessary, at trial.

### FOURTH CAUSE OF ACTION
#### (Breach of implied covenant of good faith and fair dealing with respect to the Inquest Clause)

95.     The AAA-ICDR's failure to take any action with respect to the Arbitrator's declination to enforce the Inquest Clause was a breach of the implied covenant of good faith and fair dealing.

96.     Inherent in the AAA-ICDR's acceptance of the case for arbitration based on the Operating Agreement's arbitration provision – and in the absence of any warning to the contrary at the time of accepting the case for arbitration – was an implied covenant of good faith and fair dealing that the arbitration provision, including the Inquest Clause, would be enforced. The AAA-ICDR's failure to take any action regarding the Arbitrator's declination to enforce the Inquest Clause was a breach of good faith and fair dealing.

97.     Plaintiff suffered the same damages as under her Third Cause of Action.

### FIFTH CAUSE OF ACTION
#### (False Advertising in respect of the AAA-ICDR's termination of the arbitration due to Respondent misconduct)

98.     New York General Obligations Law ("**NYGOL**") §§ 350 and 350-a prohibits false advertising. Under § 350-a, false advertising includes the failure "to reveal facts material" to the advertising in question. Private causes of action are permitted under NYGOL § 350-e.

99.     The AAA-ICDR's failure to reveal the material fact that it could (and would) terminate an arbitration due to a respondent's misconduct – and that a claimant's fees and expenses would not be reimbursable in such an event – constituted false advertising under the NYGOL.

100.    But for this failure, Plaintiff would never have done business with the AAA-ICDR.

101.    Pursuant to the NYGOL, Plaintiff seeks recovery of the $46,795.66 paid by Plaintiff in arbitration fees and expenses.

## SIXTH CAUSE OF ACTION
### (False Advertising in respect of the Inquest Clause)

102.    The AAA-ICDR also committed false advertising under the NYGOL by failing to make absolutely clear that the Inquest Clause – which it markets to the public on its websites and through its ClauseBuilder tool – is not enforceable in arbitrations administered by the AAA-ICDR under its Commercial Rules.

103.    But for this failure, Plaintiff would never have done business with the AAA-ICDR.

104.    Pursuant to the NYGOL, Plaintiff seeks recovery of her $46,795.66 in arbitration fees and expenses.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

105.    Plaintiff's payment of fees and expenses to the AAA-ICDR and the Arbitrator caused the AAA-ICDR and the Arbitrator to be unjustly enriched at Plaintiff's expense.

106.    Given the facts and circumstances of this case, it would be against equity and good conscience for the AAA-ICDR to retain at Plaintiff's expense those fees and expenses that it kept for itself ($3,750.00) or to permit the Arbitrator to retain at Plaintiff's expense those fees and expenses that he kept for himself ($18,041.66).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court:

(a) Award monetary and compensatory damages consisting of (i) the $46,795.66 paid by Plaintiff in arbitration fees and expenses, (ii) the $45,000.00 Original Investment, and (iii) the $3,696.10 Additional Investment; and

(b) Award such other relief (including without limitation injunctive relief) as is just, equitable and proper, including the costs of this action and interest.

Dated:  May 12, 2021
       New York, New York

/s/ David E. Schorr
David E. Schorr, Esq.
Attorney for Plaintiff
295 Madison Avenue, Floor 12
New York, NY 10017
(917) 756-5983

# EXHIBIT A



 **AMERICAN ARBITRATION ASSOCIATION®** | **INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®**

About · Rules · Contact Us

 **ALTERNATIVE DISPUTE RESOLUTION ClauseBuilder® Tool** 

Welcome ⟩ Clause Type ⟩ Clause Options ⟩  Review

# Non-Payment of Arbitration Expenses

The Commercial Rules provide parties with certain remedies if arbitrator compensation or administrative charges have not been paid in full by either side. However, parties can agree to certain consequences (i.e.: waiver) if either party fails to pay its share of required deposits for arbitrator compensation or administrative charges by including the following option.

○ Leave the arbitration clause silent regarding the non-payment of arbitration forum fees.
○ The parties agree that failure or refusal of a party to pay its required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that party to present evidence or cross-examine witness. In such event, the other party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award. Such waiver shall not allow for a default judgment against the non-paying party in the absence of evidence presented as provided for above.

## Standard Arbitration Clause Options

▸ Number of Arbitrators

  Method of Arbitrator Selection: AAA Commercial Arbitration Rules

▸ Arbitrator Qualifications

▸ Locale Provisions

▸ Governing Law

▸ Discovery

▸ E-Discovery

▸ Documents Only Hearing

▸ Duration of Arbitration Proceedings

▸ Remedies

▸ Assessment of Forum Fees and Attorneys' Fees

▸ Opinion Accompanying the Award

▸ Confidentiality

▸ Non-Payment of Arbitration Expenses

▸ Appeal

Previous         Skip All Options         Next ⊙

Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

© 2021 American Arbitration Association                                        ClauseBuilder (ver 4.3 v1)

Contact    Privacy    Terms of Use    Secure Case Administration                         Follow AAA®

We use cookies to improve your experience on our website. By continuing to use this website, you consent to the use of cookies. To learn more about cookies and how we use them, please see our Privacy Policy.    [ Accept ]

# <u>EXHIBIT B</u>



**INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®**

# American Arbitration Association- International Centre for Dispute Resolution Standards of Conduct for Parties and Representatives

The American Arbitration Association (AAA®) and its international division, the International Centre for Dispute Resolution (ICDR®) strive at all times to provide dispute resolution services in accordance with our Shared Mission, Vision and Values. AAA and ICDR employees' conduct is governed by *Standards of Ethics and Business Conduct*, and the conduct of our arbitrators and mediators is governed by separate codes of ethics as well.[1]

The AAA also requires that parties and their representatives ("Participants") conduct themselves in an appropriate manner when utilizing the AAA's services. Participants in AAA cases are required to abide by the following standards of conduct, and failure to do so may result in the AAA declining to further administer a particular case or caseload.

- Participants in AAA-administered cases shall treat all employees and others involved in the proceedings in a courteous, respectful and civil manner.

- Participants must respect the AAA's policy against any form of unlawful discrimination based on an individual's gender, race, ethnicity, age, religion, national origin, or any other legally-protected characteristic.

- Participants shall not engage in harassing, threatening, or intimidating conduct toward AAA employees or arbitrators/mediators.

- Party representatives shall advise their clients and witnesses of the appropriate conduct that is expected of them during the proceedings.

- Participants shall refrain from using vulgar, profane, or otherwise inappropriate language.

- Participants shall direct case-related communications only to their assigned case management staff at the phone, email, or address provided by AAA staff, and shall copy the other parties on such communications as required by the rules governing the case, or as directed by the AAA. Those assigned case-management staff will raise matters with other AAA executives directly and as necessary.

- Participants shall not contact members of the AAA's Board of Directors on case-related matters. The AAA's Board has no involvement in the day-to-day management of the AAA, and AAA Directors do not have any authority or input regarding the administration or outcome of a particular matter.

- Threats of violence or other unlawful conduct will not be tolerated and will be forwarded to law enforcement authorities.

- Participants shall not repeatedly file unmeritorious demands for arbitration, pleadings, or other papers, or engage in other tactics that the AAA or an arbitrator determines are frivolous, filed for the purpose of harassment, or primarily intended to cause unnecessary delay or increased costs.

---

[1]   These codes include the *Code of Ethics for Arbitrators in Commercial Disputes*, the *Code of Professional Responsibility for Arbitrators of Labor-Management Disputes*, and the *Model Standards of Conduct for Mediators*.

 

- Participants shall not withdraw a previously filed matter for the purpose of refiling the same or similar matter due to their discontent with the actions or decisions of the AAA, its case administrator, or the arbitrator/mediator.

- Participants shall not have previously been declared to be a vexatious litigant or similar equivalent in any state or federal court or by an arbitrator in a prior arbitration.