UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MARCIA SCHORR, | | |
| | Plaintiff, | 21 Civ. 5569 (PAE) |
| -v- | | OPINION & ORDER |
| AMERICAN ARBITRATION ASSOCIATION INC., THE INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION, and SEBASTIAN DOGGART | | |
| | Defendants. | |

PAUL A. ENGELMAYER, District Judge:

This decision resolves two pending motions to dismiss.  Plaintiff Marcia Schorr sues the American Arbitration Association ("AAA"), the International Centre for Dispute Resolution ("ICDR") (collectively, the "AAA-ICDR"), and the respondent in an underlying arbitration dispute, Sebastian Doggart.  The heart of Schorr's grievance is that the AAA-ICDR wrongly terminated the arbitration of her dispute with Doggart before a decision on the merits could be reached, and in the course of which she had incurred fees and expenses.  In her Second Amended Complaint, Schorr seeks damages equivalent to the fees she paid the AAA-ICDR, and injunctive relief in the form of an order vacating the AAA-ICDR's decision to terminate the arbitration, appointing a new, non-AAA-IDCR arbitrator, and directing that new arbitrator to hold an arbitral inquest under the Organizing Agreement's "inquest clause."  Dkts. 27, Dkt. 31 (as amended) ("SAC").

The AAA-IDCR now moves to dismiss this case in its entirety for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Schorr opposes that motion.  *Pro se* defendant Doggart also moves to dismiss the SAC under Rule 12(b)(6), to sanction Schorr's attorney under

Rule 11, and for an order directing Schorr to present herself via video to confirm her assent to

the instant litigation.  For the reasons below, the Court grants the motions to dismiss but denies

Doggart's motion for other relief.

## I.    Background[1]

### A.    Factual Background

#### 1.  The Operating Agreement and Its Arbitral Provisions

In September 2018, Schorr entered into a written "Operating Agreement" with Doggart.

SAC ¶ 5.  Doggart is a New York resident and national of the United States, United Kingdom,

and Cuba.  *Id.* ¶ 4.  The Operating Agreement aimed to establish a joint venture concerning real

property in Cuba.  *Id.* ¶ 5.

Under the Operating Agreement, a New York limited liability company (the "LLC") was

to be established as the beneficial owner of title and access rights to approximately 85 acres of

rural land located on or near a UNESCO World Heritage Site in Cuba.  *Id.*  Schorr paid $45,000,

along with additional payments totaling $3,696.10, for a one-half membership interest in the

---

[1] The following account is drawn from the SAC.  For the purpose of resolving the motions to dismiss, the Court accepts as true all factual allegations in the SAC, drawing all reasonable inferences in Schorr's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 45 (2d Cir. 2012). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  Because the SAC incorporates by reference the documents that the motion to dismiss attaches as exhibits, *see* Dkt. 34-1, the Court also considers them.  These include the AAA's Commercial Arbitration Rules, an image of the "Welcome" webpage of the AAA's Clause-Builder tool, the AAA's letter to Schorr and Doggart accepting Schorr's demand for arbitration, and the AAA-ICDR Standards of Conduct.  *See DiFolco*, 622 F.3d at 111 ("Where a document is not incorporated by reference, the court may [nevertheless] consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." (citation omitted)).

LLC. *Id.* ¶¶ 5–7. Schorr alleges that this one-half interest is, in fact, worth much more than $45,000 due to the substantial difficulties in obtaining property rights in Cuba. *Id.* ¶ 5.

Pursuant to the Operating Agreement, Doggart held the other one-half membership interest in the LLC. *Id.* ¶ 6. Although the Operating Agreement listed Doggart as having contributed $45,000, he never paid any amount for his interest. *Id.* ¶ 6 n.5. Doggart was to hold the property rights in his name on behalf of the LLC. *Id.* ¶ 5.

The Operating Agreement provided that all disputes thereunder be settled by arbitration in New York County, and administered by the AAA in accordance with its Commercial Arbitration Rules. *Id.* ¶ 10. Article 11.5(b) of the Operating Agreement stated that the arbitrator may "determine how the costs and expenses of the arbitration shall be allocated between the parties." *Id.* ¶ 16. The Operating Agreement also included an "Inquest Clause." It provides:

> The parties agree that failure or refusal of a party to pay his/her required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that party to present evidence or cross-examine witness [sic]. In such event, the other party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award. Such waiver shall not allow for a default judgment against the non-paying party in the absence of evidence presented as provided for above.

*Id.* ¶ 17.

Schorr alleges that the AAA-ICDR encourages parties whose agreements provide for AAA arbitration to include such an Inquest Clause, to incent parties to pay arbitral expenses:

> The Commercial Rules provide parties with certain remedies if arbitrator compensation or administrative charges have not been paid in full by either side. However, parties can agree to certain consequences (i.e.: waiver) if either party fails to pay its share of required deposits for arbitrator compensation or administrative charges by including the following option [re: the Inquest Clause].

*Id.* ¶¶ 23–25 (brackets in original). The Inquest Clause in the Operating Agreement, Schorr alleges, was drawn verbatim from the AAA-ICDR's "ClauseBuilder" tool, an online drafting tool

the organization advertises on various websites. *Id.* ¶¶ 18–23. The AAA-ICDR markets its ClauseBuilder tool as a "simple, self-guided process" for parties to customize their contractual arbitration clauses "with options that control for time and cost," such as the Inquest Clause. *Id.* ¶ 22. Schorr alleges that, but for the Inquest Clause, she would not have agreed to the inclusion of an arbitration clause in the Operating Agreement or to the AAA as the arbitral body. *Id.* ¶ 26. To use the ClauseBuilder tool, users had to check a box affirming their consent to terms and conditions stating: "The AAA makes no representations or warranties regarding the enforceability of clauses or the AAA's acceptance for administration of matters that might be based upon the ClauseBuilder," *id.*, and "you should not act or rely on the information contained in this website without first seeking the advice of an attorney," Dkt. 34-3. Schorr alleges that "[a]t no time prior to or after accepting the case for arbitration" did the AAA-ICDR inform her that the Inquest Clause might not be enforceable. SAC ¶ 31.

The Operating Agreement also incorporates by reference the AAA's Commercial Rules. *Id.* ¶ 66; *see* Dkt. 34-2 (Rules). Those rules state, *inter alia*, that "[t]he parties, by written agreement, may vary the procedures set forth in these rules." SAC ¶ 66. The Commercial Rules also state:

> Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

*See* Dkt. 34-2 at 30 (R-52(d)).[2]

## 2. The Underlying Dispute

---

[2] For exhibits with both internal and Bates-stamped numbering, the Court cites the Bates-stamped page numbers.

On February 25, 2020, Doggart informed Schorr that he intended to sell the property rights covered by the Operating Agreement to an undisclosed buyer, without Schorr's consent, within 48 hours.  SAC ¶ 28.  That same day, Schorr filed a demand for arbitration with the AAA. *Id.* ¶ 30.  She sought money damages and a preliminary injunction preventing Doggart from disposing of the property rights pending the outcome of the arbitration.  *Id.* ¶ 30 & n.10.  After the property rights' sale,[3] Schorr sought only money damages.  *Id.*  Schorr was represented in that arbitration proceeding by her son, David E. Schorr, who is also her attorney in the instant case.[4]  *Id.* n.1.

---

[3] To date, Schorr does not know to whom Doggart transferred the property rights.  SAC ¶ 29. But she suspects that he transferred them to a "straw man" who holds the rights on his behalf. *Id.*

[4] The AAA-ICDR argues that Mr. Schorr's representation of his mother is impermissible.  *See* Motion at 11 n.6. (citing docket 25 ("As stated in the complaint, I am plaintiff's son and represented her in the terminated arbitration.  I also, on her behalf, made and handled the investment that was at issue in the terminated arbitration.")); *see also* Schorr Decl., Ex. 3, at 4. "District courts have broad discretion to disqualify attorneys, but it is a 'drastic measure' that is viewed with disfavor in this Circuit," and "the party seeking the motion must "meet a high standard of proof before the motion may be granted.'  *Ritchie v. Gano*, No. 07 Civ. 7269 (VM) (JCF), 2008 WL 4178152, at *2 (S.D.N.Y. Sept. 8, 2008); *see Streichert v. Town of Chester, N.Y.*, No. 19 Civ. 7133 (KMK), 2021 WL 735475, at *4–5 (S.D.N.Y. Feb. 25, 2021) ("In deciding such a motion, the Court must strive to balance a client's right to freely choose his counsel against the need to maintain the highest standards of the profession." (internal quotation marks omitted)).  "Disqualification is warranted only where violations of the canons of the Code of Professional Responsibility . . . pose 'a significant risk of trial taint.'"  *Ritchie*, 2008 WL 4178152, at *3.  The Court declines to exercise its discretion here to disqualify Mr. Schorr.  No jury trial has been demanded and therefore, there "appears to be little risk to the trial process" presented by allowing Schorr to be represented by her son.  *Gormin v. Hubresgen*, No. 08 Civ. 7674 (PGG), 2009 WL 508269, at *3 (S.D.N.Y. Feb. 27, 2009) (no risk to trial process where counsel had stated he would not be trial counsel).  Nor has the AAA-ICDR made any concrete arguments as to why Mr. Schorr would be as a potential witness, and if so, why his testimony would be "'significantly useful' to his client's case" or if, for example, it might be "merely cumulative."  *Orbetta v. Dairyland USA Corp.*, No. 20 Civ. 9000 (JPC), 2022 WL 134873, at *2 (S.D.N.Y. Jan 14, 2022) ("Merely cumulative testimony thus does not warrant disqualification.").  As for Doggart's statements that Mr. Schorr is "using his mother as a strawman" to "hide assets from his ex-wife," Dkt. 52 ("Doggart Motion") ¶ 27, such *ad hominem*

### 3. Schorr's Fee Payments

As a precondition to accepting the case for arbitration, the AAA-ICDR required that Schorr pay it a $3,750 fee. *Id.* ¶ 32. Schorr paid that fee. *Id.* ¶ 33. Schorr claims that she paid this and subsequent fees to the AAA-ICDR on the belief that she would have the opportunity to recover them from Doggart as part of the eventual arbitral award. *Id.* ¶¶ 31, 34, 37, 50, 52, 63, 70.

After receiving Schorr's payment, the AAA-ICDR appointed an emergency arbitrator to hear Schorr's preliminary injunction application. *Id.* ¶ 35. On February 27, 2020, the AAA-ICDR asked Schorr to pay a $19,950 deposit for the emergency arbitrator's compensation. *Id.* ¶ 36. It warned her that failure to pay could result in the emergency arbitrator postponing or terminating the proceeding. *Id.* Schorr again paid. *Id.* ¶ 37. Doggart attempted, unsuccessfully, to recuse the emergency arbitrator. *Id.* ¶¶ 40–41.

On March 16, 2020, the emergency arbitrator granted Schorr's application for a preliminary injunction, and ordered Doggart to pay 50% of the costs (subject to further allocation in a final arbitral award) that Schorr had incurred in connection with the application. *Id.* ¶¶ 42–43. Doggart never did so. *Id.* ¶ 43. On March 20, 2020, the AAA-ICDR advised the parties that it would bill Schorr and Doggart "in equal shares" for all arbitral fees and expenses. *Id.* ¶ 44.

On April 28, 2020, the AAA-ICDR appointed a new arbitrator to preside over the balance of the arbitration. *Id.* ¶ 45. Doggart attempted to recuse the new arbitrator, too—again, unsuccessfully. *Id.* ¶ 46.

---

attacks do not have a proper place in a federal court, let alone support disqualification. The Court declines to address them further.

On May 4, 2020, the AAA-ICDR notified the parties that the arbitrator had requested a $5,000 deposit for his fees, to be paid by May 18, 2020. *Id.* ¶ 48. It again warned that failure to pay could result in a postponement or termination of the proceedings. *Id.* Schorr paid her $2,500 half of the fees; Doggart, again, did not. *Id.* ¶¶ 50–51. On May 19, 2020, the AAA-ICDR requested that Schorr pay the remaining $2,500 fees no later than May 21, 2020. *Id.* ¶ 51. On May 20, 2020, Schorr paid the additional $2,500. *Id.* ¶ 52.

On an unspecified date thereafter, the AAA-ICDR notified Schorr that the emergency arbitrator was owed an additional $5,054, as a precondition to the arbitration going forward. *Id.* ¶ 53. The AAA-ICDR's Notice of Compensation Arrangements states that, if money is owed to their arbitrators after the arbitrators' service has ended, the AAA-ICDR is "authorized but not obligated to seek to collect these monies on your behalf." *Id.* ¶ 54. Schorr paid the $5,054 in full. *Id.* ¶ 55.

On May 29, 2020, the AAA-ICDR sent Schorr an email stating that Schorr's advancement of 100% of the arbitration fees would be "subject to reallocation and shall be assessed by the arbitrator in the final award," and citing Rule 47 of the Commercial Arbitration Rules. *Id.* ¶ 56. The AAA-ICDR did not warn Schorr that it could terminate the arbitral proceedings prior to completion due to a party's misconduct. *Id.* ¶ 57.

On June 26, 2020, the AAA-ICDR requested that Schorr alone pay an additional $5,000 deposit by July 16, 2020. *Id.* ¶¶ 59–60. Again, the AAA-ICDR warned that failure to pay could result in postponement or termination of the arbitration proceeding. *Id.* ¶ 60. In rejecting Schorr's request that each party pay half of that sum, the arbitrator stated: "[B]efore I render a final award, I will entertain an application that I assess the 100% of the arbitrator's fees and AAA costs against one party." *Id.* ¶ 62. Schorr paid the full $5,000. *Id.* ¶ 63.

Sometime during summer 2020, given Doggart's failure to pay any part of the fees and expenses of the arbitration to date, Schorr requested that the arbitrator "enforce the Inquest Clause and . . . thereby conclude the arbitration by holding an inquest on damages." *Id.* ¶ 64.  On September 4, 2020, the arbitrator declined to do so, on the ground that doing so conflicted with AAA Commercial Rule 57(b).  *Id.* ¶ 65.  That rule states, in relevant part:  "In no event, however, shall a party be precluded from defending a claim or counterclaim."  *Id.*  Schorr alleges that she would not have included an arbitration clause in the Organizing Agreement, or used the AAA as the arbitral body to resolve the later dispute, had she known that the AAA-ICDR would not enforce the Inquest Clause in this context.  *Id.* ¶¶ 27, 34.

On November 6, 2020, the AAA-ICDR requested that Schorr pay $8,041.66 within two weeks, to "cover" $2,541.66 in existing arbitrator fees and a new $5,500 fee deposit that the arbitrator sought.  *Id.* ¶ 68.  On November 10, 2020, the AAA-ICDR followed up with another request for payment of the $8,041.66.  *Id.* ¶ 69.  It warned that failure to pay could result in postponing or terminating the proceeding, and required that payment be made by November 24, 2020.  *Id.*  On November 24, 2020, Schorr made the payment.  *Id.* ¶ 70.

On December 18, 2020, the arbitrator struck Doggart's counterclaims due to his failure to pay any arbitration fees or expenses.  *Id.* ¶ 71.  The arbitrator also struck nearly all of Doggart's discovery requests as "per se objectionable."  *Id.* ¶ 71 & n.15.  Doggart did not comply with Schorr's discovery request.  *Id.* ¶ 71.

In total, Schorr advanced $46,795.66 in fees to the AAA-ICDR.  *Id.* ¶ 106.

### 4.  The Termination of the Arbitration

Schorr alleges that, throughout the arbitral proceedings, Doggart was abusive, disrespectful, and threatening to the AAA-ICDR's personnel, the emergency arbitrator, and the

arbitrator who followed.  *See, e.g.*, *id.* ¶¶ 38, 47, 72.  Doggart "repeatedly refused" to comply with those officials' orders and directives and sought to subvert the arbitration process—whereas Schorr complied fully and participated in good faith.  *Id.* ¶ 38.

For example, during a February 28, 2020 scheduling conference with the emergency arbitrator, Doggart stated that he did not recognize the emergency arbitrator's authority, that the arbitration was "ridiculous" and "illegal," and that the emergency arbitrator and the AAA were acting aggressively and antagonistically towards him.  *Id.* ¶ 39.  Doggart also allegedly falsely claimed that his nonprofit organization was investigating the emergency arbitrator and his law firm for "gross overbilling and attorney misconduct," and sought to recuse the emergency arbitrator, describing him and Schorr's attorneys as "two rich, Jewish, American attorneys."  *Id.* ¶¶ 39–40.  The AAA-ICDR denied the request.  *Id.* ¶ 41.  Doggart also, according to Schorr, "repeatedly threatened and abused the [new] arbitrator" who succeeded the emergency arbitrator, including, at every telephonic appearance, purposely "mispronounc[ing] the Arbitrator's Jewish-sounding last name to make it sound 'more' Jewish-sounding."  *Id.* ¶ 47.  Doggart also allegedly threatened and abused the AAA-ICDR case managers, accusing them of "aiding and abetting [Schorr's attorney's] illegal actions" and threatening to sue them personally.  *Id.* ¶ 72.

On October 21, 2020, as a result of Doggart's behavior, the AAA-ICDR sent an email to the parties, instructing them to comply with the AAA-ICDR Standards of Conduct (the "Standards").  *Id.* ¶ 73.  The Standards provide that participants' "failure to [abide by the Standards] may result in the AAA declining to further administer a particular case or caseload."  *Id.* ¶ 74.  The Standards are not referenced in the Commercial Rules.  *Id.* ¶ 76.  Schorr alleges that, at all times, she complied with the Standards.  *Id.* ¶ 77.

On March 8, 2021, with an arbitral hearing scheduled to be completed by the end of May 2021, Doggart sent a threatening letter to the arbitrator and the AAA-ICDR. *Id.* ¶ 79. Schorr alleges the letter was a "calculated" attempt to "scare the AAA-ICDR and the Arbitrator" and disrupt the proceedings. *Id.* In it, among other comments, Doggart warned the arbitrator to "consider [his] position very carefully," threatened the AAA-ICDR with "unspecified consequences" if the arbitration were completed, and accused the arbitrator of bias, committing fraud and ethics violations, and turning the AAA into a "kangaroo court." *Id.* Doggart claimed that the proceedings had caused him "Legal Abuse Syndrome (LAS), a form of post-traumatic stress disorder." *Id.*

On March 19, 2021, the AAA-ICDR notified the parties via letter that it had "'administratively' terminated the arbitration due to 'our employees and the arbitrator hav[ing] been subjected to continued violations of the Standards.'" *Id.* ¶ 82 (alterations in original) ("Termination Letter"). The Termination Letter was from the Vice President of the ICDR, with the General Counsel of the AAA-ICDR copied. *Id.* ¶ 83. It did not indicate who had decided to terminate the proceedings or the procedure by which that decision had been reached. *Id.* Schorr alleges that the General Counsel and Vice President made the decision to terminate the arbitration proceeding together—and without the involvement of the AAA-ICDR's two administrative review bodies. *Id.* ¶¶ 84–85.

After receiving the Termination Letter, Schorr, through counsel, had several email exchanges with the General Counsel. On March 22, 2021, Schorr emailed the General Counsel asking to discuss the AAA-IDCR's termination of the proceedings. *Id.* ¶ 86. The General Counsel did not respond. *Id.* In response to a second email from Schorr, the General Counsel informed Schorr that Doggart "would need to be advised of and be permitted to participate in any

discussion of the arbitration." *Id.* ¶ 87.  When Schorr responded asking for guidance on Doggart's participation, the General Counsel did not respond.  *Id.*  On March 26, 2021, Schorr asked the General Counsel if the AAA-ICDR would consider restarting the arbitration or, alternatively, reimbursing her for the $46,795.66 she had advanced in fees and expenses.  *Id.* ¶ 88.  On April 12, 2021, the General Counsel refused both requests.  *Id.* ¶ 89.

On April 15, 2021, Schorr also sought reimbursement of $18,041 in fees from the arbitrator directly.  *Id.* ¶ 90.  The arbitrator stated a response was forthcoming.  *Id.*  The next day, the AAA-ICDR's counsel informed Schorr that he had been retained to represent the AAA-ICDR and the arbitrator.  *Id.* ¶ 91.  Thereafter, and before Schorr filed this suit, opposing counsel declined requests to reimburse Schorr $46,795.66, *id.* ¶ 92, or $34,293.66 for fees incurred in the arbitration, *id.* ¶ 93.

Schorr alleges that the AAA never informed her that it could terminate proceedings before completion—and before issuing any award reallocating the fees she alone had advanced to the AAA-ICDR.  *See, e.g.*, *id.* ¶ 31.  She alleges that she would not have applied to the AAA for a preliminary injunction had she known this.  *See, e.g.*, *id.* ¶¶ 27, 34.

### B.    Procedural Background

On May 12, 2021, Schorr filed suit against the AAA-ICDR in New York state court. Dkt. 1-1.  Schorr alleged that, in bringing her claim before the AAA and advancing fees to the AAA-ICDR, she had acted in reliance that the arbitration would reach completion and result in the issuance of a final award.  *Id.*  Schorr alleges that the arbitrator's decision to terminate the proceedings midstream unlawfully deprived her of the ability to recover (1) the $46,795.66 in fees she had advanced to the AAA-ICDR, and (2) the $48,696 Doggart allegedly owed her for selling the Cuban property rights at issue in the underlying arbitration.  *Id.*  Schorr's lawsuit

brought breach of contract, false advertising, and unjust enrichment claims against the AAA-ICDR.  *Id.*

On June 25, 2021, the AAA-ICDR removed the action to this Court, based on Chapter 2 of the FAA.  Dkt. 1.  On June 28, 2021, the Court scheduled an initial conference for August 4, 2021.  Dkt. 5.  On July 1, 2021, the AAA-ICDR filed a motion to dismiss.  Dkt. 8.

On July 12, 2021, Schorr moved to remand on the ground that the FAA does not provide subject matter jurisdiction for her lawsuit, Dkt. 14-1, and the Court adjourned the scheduled conference pending resolution of the motion to remand, for which it set a briefing schedule.  Dkt. 15.  On July 14, 2021, Schorr filed the Amended Complaint.  Dkt. 16.  On July 15, 2021, Schorr filed a letter seeking a stay of briefing on the AAA-ICDR's anticipated motion to dismiss pending resolution of the motion to remand.  Dkt. 17.  The Court granted the stay.  Dkt. 18.  On July 27, 2021, the AAA-ICDR filed an opposition to the motion to remand.  Dkt. 19.  On July 28, 2021, Schorr filed a reply.  Dkt. 20.  In a decision issued on February 1, 2022, the Court denied the motion to remand, lifted the stay of briefing on the AAA-ICDR's motion to dismiss, and instructed Schorr to file any amended complaint within 21 days, with the warning that no further opportunities to amend would ordinarily be granted.  Dkt. 22.

On February 4, 2022, the AAA-ICDR requested to adjourn the conference, in light of Schorr's pending SAC, Dkt. 23, the Court denied that request, Dkt. 24.  On February 7, 2022, the parties filed a proposed case management plan.  Dkt. 25.  On February 10, 2022, the Court held an initial conference at which it stayed discovery pending the resolution of the AAA-ICDR's anticipated motion to dismiss.  Dkt. 26.

On February 23, 2022, Schorr filed the SAC.  Dkt. 31 (amending Dkt. 27).  It brings eight claims.  *Id.*  Grouped by the conduct at issue, these include: (1) breach of contract, *id.* ¶¶ 97–109,

(2) breach of the covenant of good faith and fair dealing, *id.* ¶¶ 110–12, (3) promissory estoppel, *id.* ¶¶ 118–21, and (4) recission claims, *id.* ¶¶ 122–23, all based on the AAA-ICDR's termination of the arbitration before its completion; (5) negligence or tortious failure to exercise reasonable skill, *id.* ¶¶ 113–17, and (6) false advertising claims under New York General Business Law ("NYGBL"), both based on the AAA-ICDR's failure to protect the arbitral process from Doggart's misconduct, *id.* ¶¶ 124–28; (7) a NYGBL false advertising claim based on the AAA-ICDR's failure to enforce the Inquest Clause, *id.* ¶¶ 129–32; and (8) an unjust enrichment claim, based on the retention of arbitration fees Schorr paid, *id.* ¶¶ 133–34.  The SAC seeks damages of $46,795.66 and injunctive relief—namely, that the Court vacate the AAA-ICDR's termination of the arbitration, appoint a new, non-AAA-ICDR arbitrator, and order that new arbitrator to hold an arbitral proceeding under the Organizing Agreement's Inquest Clause.  *Id.* ¶¶ 27–28.  The SAC does not identify which, if any, of the claims is against Doggart.  *Id.*

On March 14, 2022, the AAA-ICDR moved to dismiss the SAC, Dkt. 34, and filed accompanying exhibits, Dkts. 34-1–31-5, and a memorandum of law, Dkt. 34-6, ("AAA-ICDR Motion").  On March 17, 2022, the Court received, via email, a letter from *pro se* defendant Doggart.  Dkt. 35.  On March 18, 2022, the Court ordered Schorr to serve Doggart by May 24, 2022, provided deadlines for Doggart's answer or motion to dismiss, and stated that it would resolve Doggart's responsive pleading in tandem with the AAA-ICDR's motion to dismiss.  Dkt. 35.  On March 23, 2022, Schorr served Doggart.  Dkt. 37.

On March 24, 2022, Schorr requested an extension of time to respond to the motion to dismiss.  Dkt. 36.  On March 25, 2022, the Court granted the request.  Dkt. 38.  Also on March 25, 2022, Doggart objected to Schorr's request via email.  The Court noted this in an order memorializing Doggart's email and stating that it would not respond to further email

communications.  Dkt. 39.  On April 5, 2022, Doggart filed a statement in support of the AAA-IDCR's motion to dismiss, to which he attached an unredacted copy of a decision in a matrimonial action involving Schorr's counsel.  Dkt. 40 & Ex. 1.  On April 7, 2022, Schorr's counsel moved to seal the matrimonial decision.  Dkt. 41.  The same day, the Court temporarily granted Schorr's letter motion, and ordered him to file proposed redactions and supporting materials, consistent with the Court's individual rules, by April 11, 2022.  Dkt. 43.

On April 8, 2022, Schorr opposed the AAA-ICDR's motion to dismiss the SAC.  Dkt. 43.  Also on April 8, 2022, Doggart opposed the motion to seal, which had already been granted, arguing that the instant case was "fraudulently filed."  Dkt. 44.  On April 10, 2022, Schorr filed an amended opposition.  Dkt. 45 ("Pl. Opp.").  On April 11, 2022, Schorr filed a letter with the proposed redactions, but requested that the Court consider sealing the matrimonial decision in full as irrelevant to Doggart's defense in this case.  Dkt. 47.  Later that day, Doggart filed a letter opposing Schorr's request to seal the matrimonial decision, but assenting to its partial redaction.  Dkt. 48.  On April 21, 2022, the AAA-ICDR replied.  Dkt. 49 ("Reply").  On April 22, 2022, the AAA-ICDR moved the Court to permit the reply, whose filing, it stated, had been delayed due to confusion regarding the deadline.  Dkt. 50.  That day, the Court granted the AAA-ICDR's motion.  Dkt. 51.

Also on April 22, 2022, Doggart moved to dismiss the SAC, Dkt. 53, and filed an accompanying response to Schorr's opposition that agreed with the AAA-ICDR that dismissal based on arbitral immunity was required, and argued that the SAC should be dismissed under Rule 12(b)(6), and sought sanctions against Mr. Schorr, Doggart Motion.  On May 6, 2022, Schorr requested an extension of time to oppose the Doggart Motion, Dkt. 54; Doggart opposed the request, Dkt. 55.  The same day, the Court granted the extension.  Dkt. 56.  On May 12,

14

2022, Schorr filed a declaration opposing Doggart's Motion, Dkt. 57 ("Schorr Decl."), and supporting exhibits, Dkts. 57-1–57-3.  On May 12, 2022, Schorr requested that the arbitrator's name remain redacted.  Dkt. 58.  On June 13, 2022, the Court granted Schorr's request to seal the arbitrator's name, Dkt. 60, and the matrimonial decision in full, Dkt. 61.

## II.     Legal Principles

### A.     Motions Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145.  That tenet, however, does not apply to legal conclusions.  *See Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  And "[i]n considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco*, 622 F.3d at 111.

### B.     *Pro Se* Pleadings

As to all motions, a court must construe *pro se* plaintiffs' pleadings liberally and interpret them to raise the strongest arguments that they suggest.  *See Fuller v. Armstrong*, 204 F. App'x

987, 988 (2d Cir. 2006) (summary order); *see also John Wiley & Sons, Inc. v. Treeakarabenjakul*, No. 09 Civ. 2108 (CM), 2009 WL 1766003, at *8 (S.D.N.Y. June 18, 2009) (*pro se* defendant).

## III.   Discussion

In moving to dismiss under Rule 12(b)(6), the AAA-ICDR and Doggart primarily argue that the SAC's claims are barred by arbitral immunity and, in the alternative, are foreclosed by the AAA's Commercial Rules.  For the following reasons, the Court grants the motions to dismiss, although the bases for dismissal differ based on the particular claim at issue.

### A.   Arbitral Immunity

The AAA-ICDR argues that the doctrine of arbitral immunity immunizes it entirely from Schorr's claims.  AAA-ICDR Motion at 13–18.  "[A]rbitrators in contractually agreed upon arbitration proceedings are absolutely immune from liability in damages for all acts within the scope of the arbitral process."  *Austern v. Chi. Bd. of Options Exch., Inc.*, 898 F.2d 882, 886 (2d Cir. 1990), *cert denied*, 498 U.S. 850 (1990).  "That rationale extends equally to claims against arbitral administrative institutions, when they perform 'functions that are integrally related to the arbitral process.'"  *Glob. Gold Min., LLC v. Robinson,* 533 F. Supp. 2d 442, 448 (S.D.N.Y. 2008) (quoting *Austern*, 898 F.2d at 886).  In this regard, "the scope of arbitral immunity is 'defined by the *functions* it protects and serves,'" and encompasses actions that were "performed directly in connection with the [organization's] management of contractually agreed upon arbitration" and "were sufficiently associated with the adjudicative phase of the arbitration to justify immunity."  *Austern*, 898 F.2d at 886 (emphasis in original) (quoting *Forrester v. White*, 484 U.S. 219, 227 (1990)) (defective notice and improper panel selection were associated with adjudicative phase of arbitration to justify immunity).

16

### 1.   The One Claim Barred by Arbitral Immunity

Of the SAC's eight claims, one clearly targets conduct "associated with the adjudicative phase of the arbitration to justify immunity." *Id.*  In its seventh claim, the SAC alleges that the AAA-ICDR violated NYGBL §§ 349 and 350 by declining to enforce the Inquest Clause and/or by failing to warn Schorr that the arbitrator might interpret the clause as unenforceable, under her interpretation of it.  *See* SAC ¶ 65 (arbitrator declined to enforce on grounds that Inquest Clause conflicted with Commercial Rule 57(b)).  Interpreting arbitration agreements in light of applicable Commercial Rules is a function squarely within the adjudicative phase of the arbitration.  *Austern*, 898 F.2d at 886 (arbitral immunity applies to such conduct); *see, e.g.*, *Landmark Ventures, Inc. v. Cohen*, No. 13 Civ. 9044 (JGK), 2014 WL 6784397, at *2, *4 (S.D.N.Y. Nov. 26, 2014) (arbitral immunity barred claims that, *inter alia*, arbitrator incorrectly interpreted agreement).  The Court accordingly grants the AAA-ICDR's and Doggart's motions to dismiss the SAC's seventh cause of action, AAA-ICDR Motion at 13–18; Doggart Motion ¶¶ 3–13, on the ground that arbitral immunity bars it.  *See* SAC ¶¶ 129–32.

### 2.   The SAC's Remaining Claims

The SAC's seven other claims present an apparently novel application of the arbitral-immunity doctrine.[5]  Each challenges the AAA-ICDR's midstream termination of the arbitration[6] without resolving the underlying claims or reimbursing its fees.

The Court harbors considerable doubt whether an arbitral body's declination, after acceptance of payment, to adjudicate a controversy or reimburse the parties, qualifies as a function "sufficiently associated with the adjudicative phase of the arbitration to justify immunity."  *Austern*, 898 F.2d at 886.  Although the Second Circuit has not addressed a comparable situation, the First and Seventh Circuits have each expressed skepticism that arbitral immunity is warranted in such circumstances.  *See, e.g.*, *Caudle v. Am. Arb. Ass'n*, 230 F.3d 920, 922 (7th Cir. 2000) (stating, but not deciding, that if the "AAA had pocketed the money without arbitrating the dispute, it is unlikely that the AAA could claim 'immunity' in response to a demand for a refund (or an order to furnish the arbitration service for which it had been paid)"); *Int'l Med. Grp., Inc. v. Am. Arb. Ass'n, Inc.*, 312 F.3d 833, 844 (7th Cir. 2002) (citing *Caudle* and opining that arbitral immunity is unlikely where "the claim that one may not retain a payment for services that are never rendered can be stated entirely without reference to the

---

[5] Contrary to Doggart's argument, *Cort v. American Arbitration Association*, 795 F. Supp. 970 (N.D. Cal. 1992), is inapposite.  *See* Doggart Motion ¶¶ 8–9 (terming *Cort* is "very similar" and involved the same "act that Plaintiff and her son complain of").  The underlying arbitration in *Cort*, unlike here, was resolved and an award was issued.  *Cort*, 795 F. Supp. at 971 (alleging breach of contract, spoliation of evidence, and negligence).  The claims instead arose during the plaintiff's appeal of a confirmation of an adverse award, when the AAA allegedly refused to "return to him exhibits filed in connection with the arbitration."  *Id.*

[6] The AAA-ICDR argues that the initial "emergency arbitrator" fully resolved the narrow dispute with which he or she was tasked.  *See* AAA-ICDR Motion at 12 n.7.  That is clearly correct:  The SAC's claims are barred by arbitral immunity insofar as they attack the emergency arbitral proceedings between February 25, 2020, SAC ¶ 30, and March 16, 2020, *id.* ¶ 42.  The core of the SAC's claims, however, concerns the arbitral proceedings beginning April 28, 2020, when the AAA-ICDR appointed a "new arbitrator" to preside over the proceeding.  *See id.* ¶ 45.  That phase of the arbitral proceedings is the focus of this discussion.

arbitration"); *see also Shamrock Fisheries, LLC v. Manning*, No. 21 Civ. 10689 (ADB), 2021 WL 5811743, at *5 (D. Mass. Dec. 7, 2021) ("The Seventh Circuit [has] theorized that immunity would be inapplicable to situations where an arbitrator accepts payment for an arbitration, pockets the funds, and then refuses a refund when the arbitration is not performed.").  As these cases reflect, arbitral immunity "is an awkward fit in situations . . . in which it is alleged that arbitrators (or an entity that stands in the shoes of arbitrators) have broken a contractual promise."  *Lanza v. Fin. Indus. Regul. Auth.*, 953 F.3d 159, 164 (1st Cir. 2020) (citing *Caudle*, 230 F.3d at 922); *see also Lanza v. Fin. Indus. Regul. Auth.*, 333 F. Supp. 3d 11, 16 (D. Mass. 2018) ("[Arbitral] immunity likely does not, however, cover all disputes with an organizing body."), *aff'd on other grounds*, 953 F.3d 159 (1st Cir. 2020).

The AAA-ICDR's justification for refusing to resolve Schorr and Doggart's dispute, sounding as it does in commercial rather than adjudicative considerations, reinforces this point. *See Austern*, 898 F.2d at 885–86 (justifying arbitral immunity based on the "functional comparability" of arbitrators' and judges' roles).  The SAC states, SAC ¶¶ 73–74, 82, and the AAA-ICDR confirms, *see, e.g.*, AAA-ICDR Motion at 14, that the organization terminated the arbitration not based on its assessment of any party's claims, but on what it termed the parties'—apparently Doggart's—violations of its contractual Standards, with which Schorr and Doggart had agreed to comply as a condition for the AAA-ICDR to initiate the arbitration, *see* Dkt. 33-4 (letter initiating arbitration); AAA-ICDR Motion at 18 ("AAA did not simply abandon administration of the arbitration, but ceased administration when it determined that the parties continued to violate the Standards of Conduct.").  Put differently, the AAA-ICDR refused to perform after concluding that Doggart and Schorr had breached its terms of service—their agreement with the arbitral body.  But although the AAA-ICDR may not be contractually liable

for such a termination under the parties' agreements, *see infra* Section III.B., that does not entitle

it to arbitral immunity.

Reinforcing this reading, the SAC does not plead, and the AAA-ICDR does not argue,

that the termination was grounded in an adjudicative function such as the imposition of sanctions

pursuant to Commercial Rule 58.[7]  *See* Dkt. 34-2 (governing sanctions "upon a party's request").

*Compare Johnson v. Thompson-Smith*, 203 F. Supp. 3d 895, 901 & n.4 (N.D. Ill. 2016) (arbitral

immunity applies to dismissal for lack of jurisdiction and/or failure to prosecute), *aff'd*, 700 F.

App'x 535 (7th Cir. 2017),[8] *with* SAC ¶¶ 79–80 (termination followed a threatening letter from

Doggart to the arbitrator requesting recusal); Dkt. 57-3 (threatening letter).  Had the AAA-ICDR

justified its decision to terminate the arbitration on the ground that such was a justified sanction

for an advocate or party's improper conduct—that is, an action akin to the imposition of

sanctions under Rule 11 by a court—its claim to arbitral immunity would be far stronger, as the

imposition of sanctions, including ultimately dismissal, is a well-recognized federal judicial

function.  *See Prudential Bache-Sec. (Hong Kong) Ltd. v. Nat'l Ass'n of Sec. Dealers Disp.*

*Resol., Inc.*, 289 F. Supp. 2d 438, 440 (S.D.N.Y. 2003) (arbitrators have same immunity as

federal courts); *see, e.g.*, *Abdelhamid v. Altria Grp., Inc.*, 515 F. Supp. 2d 384, 398–400

(S.D.N.Y. 2007) (dismissing pursuant to Federal Rule of Civil Procedure 11 as alternate

---

[7] No party has placed a copy of the termination letter in the record.  The Court's assessment is perforce based on the parties' characterizations of that letter.

[8] The arbitrator in *Johnson* was a state administrative law judge and not a private arbitrator.  *See* 700 F. App'x at 538 ("Workers' compensation arbitrators in Illinois are not private arbitrators but administrative law judges who work for the state.").  Nonetheless, *Johnson*'s logic—that the decision to grant a motion to dismiss for lack of jurisdiction or failure to prosecute is an adjudicative act—applies here.  *Id.* ("[D]ecisional rulings on the progress and disposition of [a] case, are precisely the type of 'paradigmatic judicial acts' courts have held absolutely protected from civil suit.").

grounds); *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 Civ. 0400 (NRB), 2008 WL

4386764, at *15 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009) (same).  The

AAA-ICDR, however, did not so base its decision to terminate the arbitration.

Nor, as pled, was the AAA-ICDR's termination an administrative decision so "integrally

related to the arbitration" that arbitral immunity applies.  *Imbruce v. Am. Arb. Ass'n, Inc.*, No. 15

Civ. 7508 (NRB), 2016 WL 5339551, at *3 (S.D.N.Y. Sept. 23, 2016) (arbitral organization

immune for claim related to tardy fee collection); *id.* (collecting cases) (arbitration organizations

immune for administrative actions related to selecting arbitrators, billing for services, or

scheduling hearings).  The AAA-ICDR argues that applying its Standards is an administrative act

"well-within the scope of the arbitral process" that "render[s] its administrative determination

fully protected by arbitral immunity."  AAA-ICDR Motion at 14.  But, for two reasons, that

doctrine is well afield from the context in which the AAA-ICDR's terminated the Schorr-

Doggart arbitration here.

First, where courts have applied that immunity doctrine, they have typically done so to

prevent arbitral losers from using administrative decisions as a vehicle to attack, indirectly, the

outcomes of completed arbitrations.  *See, e.g.*, *Austern*, 898 F.2d at 886; *Gill v. Fin. Indus.*

*Regul. Auth.*, No. 11 Civ. 2713 (PAC) (RLE), 2013 WL 1203746, at *1 (S.D.N.Y. Mar. 6,

2013), *report and recommendation adopted*, No. 11 Civ. 2713 (PAC) (RLE), 2013 WL 1201499

(S.D.N.Y. Mar. 25, 2013); *Landmark Ventures*, 2014 WL 6784397, at *1; *Imbruce*, 2016 WL

5339551, at *2; *Buhannic v. Am. Arb. Ass'n*, No. 18 Civ. 2430 (ER), 2019 WL 4735005, at *5

(S.D.N.Y. Sept. 27, 2019) (citing *Buhannic v. Tradingscreen, Inc.*, No. 17 Civ. 7993 (ER), 2018

WL 3611985, at *3 (S.D.N.Y. July 27, 2018)); *cf. Rolon v. Henneman*, 517 F.3d 140, 143, 146–

47 (2d Cir. 2008) (police chief entitled to absolute immunity for testimony at arbitration, where

60-page decision and award had issued). *But see Kumaran v. Nat'l Futures Ass'n*, No. 20 Civ. 3668 (GHW), 2020 WL 3630389, at *4–5 (S.D.N.Y. July 2, 2020), *on reconsideration in part sub nom. Kumaran v. Nat'l Futures Ass'n*, No. 20 Civ. 3668 (GHW), 2020 WL 6264001 (S.D.N.Y. Oct. 23, 2020) (applying immunity where arbitration stayed, but was not completed). This rationale for arbitral immunity "protects the finality of judgments by discouraging inappropriate collateral attacks and also protects judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants." *Austern*, 898 F.2d at 885 (internal alterations and quotation marks omitted). Here, however, the AAA-ICDR cannot plausibly cast Schorr's lawsuit as seeking to unsettle a completed arbitration. Rather than challenging the outcome or management of the arbitration, Schorr challenges its abrupt (and non-merits) termination.

Second, where courts have applied this doctrine, it has typically been to shelter from judicial review administrative actions taken to further the progress of arbitral proceedings. For example, such decisions have immunized decisions regarding the selection and supervision of arbitrators, *see, e.g.*, *id.* at 886 (challenge to panel selection); *Buhannic*, 2019 WL 4735005, at *5 (challenge to selection of arbitrators and reviewing procedures), and case management techniques utilized during arbitrations, *see, e.g. Gill*, 2013 WL 1203746, at *6 (challenge to service); *Kumaran*, 2020 WL 3630389, at *4–5 (challenge to, *inter alia*, failure to respond to counsel's emails, *ex parte* communications, and leaked information to respondent); *Landmark Ventures, Inc.*, 2014 WL 6784397, at *4 (challenge to procedural decisions). This rationale advances the functional purpose of arbitral immunity, as administrative decisions related to arbitrator selection, communications with parties, case management decisions, and billing are essential to the orderly management and completion of arbitration proceedings, and affording

them immunity "free[s] the adjudicative process and those involved therein from harassment or intimidation." *Austern*, 898 F.2d at 885.  Here, however, even if the termination of an arbitration midstream might in some circumstances further an adjudicative end—for example, where it sanctioned a contemptuous claimant by terminating his claims—the facts pled here do not support this outcome.  On the contrary, as pled, the AAA-ICDR's decision to pretermit the arbitration in response to Doggart's vexatious conduct will leave Schorr to shoulder all party costs, paradoxically benefiting Doggart and, then, shielding that decision from judicial review.

Finally, on the facts pled, public policy disfavors applying arbitral immunity.  Doing so would excuse—with impunity—arbitral institutions who shrink from carrying though on their contractual duties as alternative dispute resolution forums.  It would invite future AAA-ICDRs to abandon their duties without adverse consequences where one party, like Doggart seemingly here, proved too irksome to abide.  It would indeed reward such behavioral stunts.  Immunizing an arbitral body on the circumstances pled would thus be inconsistent with the core rationale for recognizing arbitral immunity: to promote effective arbitrations.  *See id.* at 886 (extending arbitral immunity to sponsorship organization because encouraging arbitration is "a policy that is strongly encouraged by the Federal Arbitration Act"); *see also Imbruce*, 2016 WL 5339551, at *3 (extension of arbitral immunity to sponsoring organizations intended to encourage future arbitrations).  Far from facilitating the efficient resolution of claims, the AAA-ICDR's decision here to abort the arbitration denied Schorr the forum to which she was contractually entitled, forced her to bear the costs incurred to that point by both sides, and rewarded Doggart for his contumacy.  The AAA-ICDR's bid for immunity—tellingly supported by Doggart, the alleged provocateur—would, if applied here, perversely frustrate the Federal Arbitration Act's "liberal

federal policy favoring arbitration agreements." *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991)).

The Court accordingly declines to dismiss the SAC's remaining claims on the ground of arbitral immunity.  The Court thus turns to the AAA-ICDR's alternative ground for dismissal: that because these claims are precluded by a binding rule of the AAA-ICDR, they fail to state a viable claim.

### B.    AAA-ICDR Rule 52(d)

The AAA-ICDR and Doggart alternatively move for dismissal under Rule 12(b)(6) on the ground that the SAC's claims for relief are barred by Rule 52(d) of the AAA-ICDR's Commercial Rules and Standards.  *See* AAA-ICDR Motion at 19–22; Doggart Motion ¶ 3.  That basis for dismissal is meritorious.

Rule 52(d) releases the AAA-ICDR and its arbitrators from liability "for damages or injunctive relief for any act or omission in connection with any arbitration under [the Rules]." Dkt. 34-2 at 30 (AAA Commercial Rule 52(d)).  Courts in this Circuit "have enforced similar rules to bar claims against arbitrators and sponsoring organizations" for both damages and injunctive relief "[w]here parties have agreed to be bound by the rules of an arbitral organization." *Imbruce*, 2016 WL 5339551, at *3, *5 (dismissing claims against AAA based on Rule 52(d)); *see, e.g.*, *Landmark Ventures*, 2014 WL 6784397, at *3 ("Because the alleged conduct falls directly within Article 40 of the ICC Rules, the parties agreed that the Arbitrator and the ICC would be immune from suit and this contractual provision is binding."); *Kuruwa v. Am. Arb. Ass'n*, No. 13 Civ. 2419 (PKC), 2013 WL 2433068, at *1 (S.D.N.Y. June 3, 2013) (enforcing AAA rule barring claims for injunctive relief or damages); *Richardson v. Am. Arb. Ass'n*, 888 F. Supp. 604, 605 (S.D.N.Y. 1995) (plaintiff's claims barred by both arbitral

immunity and arbitration rules' liability waiver); *cf. Reed & Martin, Inc. v. Westinghouse Elec. Corp.*, 439 F.2d 1268, 1271, 1276–77 (2d Cir. 1971) (binding parties to AAA rules when contract provided that arbitration would be governed by them).  Here, the Operating Agreement specifically incorporated the Commercial Rules, SAC ¶ 10, including Rule 52(d), and the arbitration was initiated and conducted pursuant to those rules.  *See* Dkt. 34-4 at 3 (letter initiating arbitration).  And Schorr and Doggart separately agreed to abide by the AAA-ICDR's Standards in initiating the arbitration, *id*.  These standards empower the AAA-ICDR to "decline[] to further administer a particular case or caseload" if violated.  Dkt. 34-5 at 1.  To the extent that Schorr disagrees with the AAA-ICDR's determination to enforce the terms of that agreement, Commercial Rule 52(d) forecloses Schorr's claims entirely—whether for damages or for injunctive relief.  *See* Dkt. 34-2 at 30.

Accordingly, the Court grants the motions to dismiss on this ground.

**C.      The SAC's Petition for Vacatur**

The SAC argues that, if the AAA-ICDR's termination of the arbitration and/or the arbitrator's declination to enforce the Inquest Clause are deemed to be arbitral decisions or awards, such decision(s) or award(s) should be vacated, as a remedy for the violations of law the SAC claims.  *See* SAC ¶¶ 135–38.  Doggart counters that if these arbitral actions are so deemed—and were viewed as final[9]—Schorr's appeal would be time barred.  Doggart Motion ¶ 4; *see also* Reply at 3.

---

[9] Confronted with this argument, Schorr asserted that the AAA-ICDR's termination of the arbitration could be viewed as a non-final award.  *See* Pl. Opp. 12–15; Schorr Decl. ¶ 7 & n.7.  Although Schorr's critique of these actions is well-developed, her arguments as to what made them non-final—or on what basis a party could sue to challenge a non-final arbitral action—are not.

Because Rule 52(d) requires dismissal of the SAC's claims, the Court does not have occasion to resolve whether these actions by the arbitrator and the AAA-ICDR qualify as final arbitral decisions or awards.  But, assuming *arguendo* that these did so qualify, Doggart would be correct.  Under Section 12 of the Federal Arbitration Act, a party must provide "[n]otice of a motion to vacate, modify or correct an award . . . within three months after the award is filed or delivered."  9 U.S.C. § 12.  "The Second Circuit has made clear that there is no exception to this three month limitation period."  *See M.J. Woods, Inc. v. Conopco, Inc.*, 271 F. Supp. 2d 576, 582 (S.D.N.Y. 2003) (quoting *Kruse v. Sands Bros. & Co., Ltd.,* 226 F. Supp. 2d 484, 486 (S.D.N.Y. 2002)).  As the Circuit has explained, to expand this period would "undermin[e] the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."  *Folkways Music Publishers, Inc. v. Weiss,* 989 F.2d 108, 111 (2d Cir. 1993).

Here, Schorr's initial complaint was filed on May 12, 2021, Dkt. 1-1, well within three months of the March 19, 2021 termination.  But the initial complaint did not allege that the AAA-ICDR's decision to terminate the arbitration was a final award.  More important, the initial complaint did not seek vacatur of such an award or provide notice of Schorr's intent to move to vacate the award.  Schorr instead sought damages from the AAA-ICDR, based on theories of breach of contract, breach of implied covenant of good faith and fair dealing, false advertising, and unjust enrichment and seeking damages.  *See id.* at 19–24.  It was not until the SAC that Schorr sought vacatur of the termination decision.  *See* SAC ¶¶ 135–38.  The SAC, however, was filed on February 23, 2022, nearly a year after the AAA-ICDR's termination letter, and far outside the three-month deadline.

Accordingly, assuming (1) that Rule 52(d) did not apply and (2) that the AAA-ICDR and arbitral actions the SAC challenges were deemed final arbitral decisions or awards, the SAC's

request for vacatur would be untimely.  *See, e.g.*, *Reed v. RBMS REO Holdings, LLC*, No. 20 Civ. 5891 (GBD) (SLC), 2021 WL 4943562, at *9–10 (S.D.N.Y. July 12, 2021), *report and recommendation adopted sub nom. Reed v. RMBS Reo Holdings, LLC*, No. 20 Civ. 5891 (GBD) (SLC), 2021 WL 4480459 (S.D.N.Y. Sept. 30, 2021) (denying motion to vacate as untimely); *Kruse*, 226 F. Supp. 2d at 487 ("Respondents[] were required to file a Motion to Vacate, if they so desired, by September 18, 2022.  Having failed to do so, they have lost the opportunity to make such a Motion."); *cf. Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 175 (2d Cir. 1984) (motion to vacate cannot be raised as a defense to a motion to confirm more than three months after the final award).

### D.    Sanctions

Doggart also moves to sanction Schorr's counsel.  *See* Doggart Motion ¶¶ 21–34. Doggart argues that Schorr's claims are frivolous, in that they are clearly barred by arbitral immunity, *id.* ¶¶ 25–26, and that Schorr's claims challenging the AAA-ICDR's termination are not properly asserted against Doggart, *id.* ¶¶ 23–24.

For two reasons, the Court declines to exercise its discretion to impose sanctions and denies this aspect of Doggart's motion.  *See Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63–64 (2d Cir. 2012) (sanctions discretionary).

First, Schorr's claims were not frivolous.  As discussed above, Schorr has a sound basis to dispute that arbitral immunity applies.  Indeed, save as to one claim, the Court has found that arbitral immunity does not block the SAC's claims.  *Compare with Weinraub v. Glen Rauch Sec., Inc.*, 419 F. Supp. 2d 507, 517–18 (S.D.N.Y. 2005) (imposing Rule 11 sanctions where "any reasonable attorney would have recognized that such a claim was barred by arbitral immunity"); *see, e.g., Truong v. N.Y. Hotel & Motel Trades Council, AFL-CIO*, 603 F. Supp. 2d

27

742, 744 (S.D.N.Y. 2009) (same); *Landmark*, 2014 WL 6784397, at *5–6 (same); *see also McKenzie-Morris v. V.P. Recs. Retail Outlet, Inc.*, No. 22 Civ. 1138 (GHW), 2022 WL 16555911, at *5 (S.D.N.Y. Oct. 31, 2022) (imposing Rule 11 sanctions where court had repeatedly warned counsel that arguments were frivolous).

Second, insofar as the SAC treated the AAA-ICDR's termination as a final determination, and petitioned the Court for its vacatur, the SAC properly named Doggart, as the respondent in the underlying arbitration. *See, e.g.*, *Milberg LLP v. HWB Alexandra Strategies Portfolio*, No. 19 Civ. 4058 (AT), 2020 WL 3833829, at *1 (S.D.N.Y. July 8, 2020), *aff'd sub nom. Milberg, LLP v. Drawrah Ltd.*, 844 F. App'x 397 (2d Cir. 2021) (summary order) (considering petition to vacate where respondent was named as defendant).

Accordingly, the Court denies Doggart's motion for sanctions.

## CONCLUSION

For the foregoing reasons, the Court grants the AAA-ICDR's and Doggart's motions to dismiss the SAC's claims under Rule 12(b)(6). This dismissal is with prejudice.[10] The Court denies Doggart's motion for sanctions.

The Clerk of Court is respectfully requested to close the motions at docket numbers 34 and 53, and to close the case.

---

[10] Schorr has not requested leave to amend, let alone suggested that an amended complaint would have the capacity to correct the deficiencies identified by the AAA-ICDR and Doggart. In any event, Schorr has already amended her complaint twice, *see* Dkts. 16, 31, including once after this Court instructed that further opportunities would not ordinarily be granted, *see* Dkt. 22. Moreover, where, as here, "the problems with a claim are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to replead would be 'futile' and 'should be denied.'" *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 808 (S.D.N.Y. 2020) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

SO ORDERED.

_Paul A. Engelmayer_

PAUL A. ENGELMAYER
United States District Judge

Dated: December 27, 2022
          New York, New York